1
2
3
4
5
6
7
8
9
10

# UNITED STATES DISTRICT COURT

# EASTERN DISTRICT OF CALIFORNIA

# FRESNO DIVISION

| | |
|---|---|
| CLARENCE WARREN, | Civil No.      1:07-1285-JTM (CAB) |
|                          Petitioner, | **ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS** |
| vs. | |
| DERRAL G. ADAMS, | |
|                          Respondent. | |

## I.     INTRODUCTION AND PROCEDURAL BACKGROUND

Clarence Warren (hereinafter "Warren"), a state prisoner proceeding pro se, filed a Petition for Writ of Habeas Corpus in the Eastern District of California (Fresno Division) on August 31, 2007 [doc. no. 1].  On November 25, 2008, the Petition was reassigned to visiting District Judge Jeffrey T. Miller for all further proceedings [doc. no. 22] and, on December 18, 2008, the Petition was assigned to visiting Magistrate Judge Cathy Ann Bencivengo for all non-dispositive motions and matters and for such dispositive motions and matters as assigned [doc no. 23].

On May 19, 2003, Warren was convicted by jury of four (4) counts of robbery in violation of California Penal Code (hereafter "Penal Code") section 211 (counts

1-4 of the Felony Complaint filed against him).  As to each robbery count, the jury

found that Warren personally used a firearm in violation of Penal Code section

12022.53(b).  (Clerk's Transcript on Appeal, hereafter "CT," at 1 CT 150, 261-264;

*see* 1 CT 1-2.)  On June 17, 2003, Warren was sentenced to one hundred fifty (150)

years to life in state prison.  (1 CT 265-269; Reporter's Transcript of Appeal,

hereafter "RT," 7 RT 1301-10.)

On October 27, 2003, Warren appealed his conviction on the sole ground that

the trial court violated his right to due process when it refused to grant him a

continuance prior to hearing the merits of his motion for self-representation.  (*See*

Resp't Lods. A, B, & C.)  The California Court of Appeal, Fifth Appellate District,

affirmed the judgment.  (Resp't Lod. D, unpublished opinion filed July 2, 2004 in

the Fifth District Court of Appeal, Case No. F043278.)  On July 26, 2004, Warren

then filed a petition for rehearing in the California Court of Appeal contending that,

pursuant to *Blakely v. Washington*, 542 U.S. 296 (2004), the trial court had

improperly imposed consecutive terms based on factors not admitted by Warren and

not found by the jury to be true beyond a reasonable doubt.  (Resp't Lod. E.)  The

appellate court denied the petition for rehearing as untimely on July 27, 2004.

(Resp't Lod. F.)  On August 5, 2004, Warren filed a Petition for Review in the

California Supreme Court raising the two claims he raised separately in the

appellate court.  (Resp't Lod. G.)  On September 15, 2004, the court denied the

petition "without prejudice to any relief to which defendant might be entitled after

this court determines in *People v. Black*, [41 Cal.4th 799 (2007)], and *People v.

Towne*, [44 Cal.4th 63 (2008)], the effect of *Blakely v. Washington* on California

law."  (Resp't Lod. H.)

On March 14, 2005, Warren filed a petition for writ of habeas corpus in

Fresno Superior Court contending, essentially, that the trial court and prosecutor

violated his constitutional rights by prosecuting him for four counts of robbery and

sentencing him consecutively under California's Three Strikes Law.  The superior

1:07cv1285

court denied the petition on March 30, 2005.  (Resp't Lods. I & J.)  Also on March
14, 2005, Warren filed a petition for writ of habeas corpus in the California Court of
Appeal raising the same claim he raised in superior court.  (Resp't Lod. Q.)  On
March 17, 2005, the court of appeal denied the petition on the merits and for failing
to first seek relief in the trial court.  (Resp't Lod. R.)  On April 18, 2005, Warren
filed a habeas petition in the California Supreme Court raising the same claim
related to California's Three Strikes Law.  (Resp't Lod. W.)  The court denied the
petition on March 29, 2006.  (Resp't Lod. X.)

On June 7, 2006, Petitioner filed a second habeas petition in Fresno Superior
Court, contending that he was sentenced consecutively in violation of Penal Code
section 654.  The superior court denied the petition on the merits and for procedural
reasons on June 14, 2006.  (Resp't Lods. K & L.)  Warren filed a "First Amended
Petition" in Fresno Superior Court on June 19, 2005 (presumably sent to the court
prior to Warren receiving the superior court's denial) adding two claims: that
constitutionally insufficient evidence supported the second degree robbery
convictions and that trial counsel was constitutionally ineffective by failing to fully
investigate Warren's case.  (Resp't Lod. M.)  The superior court denied the
amended petition for lack of evidence and for procedural reasons on July 6, 2006.
(Resp't Lod. N.)  Warren filed a second  petition in the state appellate court on June
27, 2006, raising the claims concerning consecutive sentencing, insufficient
evidence, and ineffective assistance of trial counsel.  (Resp't Lod. S.)  The court of
appeal denied the petition on June 29, 2006 for lack of evidence and failure to first
seek relief in the trial court.  (Resp't Lod. T.)  Warren then filed a second habeas
petition in the California Supreme Court on July 13, 2006 raising these same claims
concerning consecutive sentencing, insufficient evidence, and ineffective assistance
of trial counsel.  (Resp't Lod. Y.)  He then filed an amended petition on December
11, 2006 raising the same claims, but supplying additional documentation from the
record.  (Resp't Lod. Z.)  On February 7, 2007, the California Supreme Court denied

3

the petition and cited *In re Clark*, 5 Cal.4th 750 (1993); *In re Swain*, 34 Cal.2d 300, 304 (1949); *People v. Duvall*, 9 Cal.4th 464, 474 (1995); and *In re Lindley,* 29 Cal.2d 709 (1947).  (Resp't Lod. AA.)

On April 4, 2007, Warren filed a third habeas petition in Fresno Superior Court contending again that consecutive sentencing violated California law in his case.  The court denied the petition on April 19, 2007.  (Resp't Lods. O & P.)  He then filed a third petition in the California Court of Appeal on May 23, 2007 contending that the consecutive sentencing in his case violated California law. (Resp't Lod. U.)  The appellate court denied that petition on May 23, 2007.  (Resp't Lod. V.)

Warren filed his federal Petition in this case on August 31, 2007  [doc. no. 1]. Warren claims, generally, that: (1) he was denied due process when he was sentenced consecutively in violation of Penal Code section 654; (2) he was denied a fair trial because the evidence was insufficient to support second degree robbery; (3) his trial counsel was constitutionally ineffective for failing to fully investigate his case; and (4) the trial court violated his right to due process when it refused to specify the length of a continuance prior to hearing the merits of his motion for self-representation.  (*See* Pet. at Grounds 1-4 and attachments.)  Respondent filed an Answer and accompanying lodgments on May 28, 2008 and June 5, 2008, respectively [doc. nos. 15 & 16].  Warren filed a Traverse on August 11, 2008 [doc. no. 21].  The Court has now considered the Petition, Answer, Traverse, and all the supporting documents submitted by the parties.  Based upon the documents and evidence presented in this case, and for the reasons set forth below, the Court **DENIES** the Petition.

## II.   **FACTUAL BACKGROUND**

This Court gives deference to state court findings of fact and presumes them to be correct.  *See* 28 U.S.C. § 2254(e)(1); *see also Parke v. Raley*, 506 U.S. 20, 35-36 (1992) (holding findings of historical fact, including inferences properly drawn

1:07cv1285

from these facts, are entitled to statutory presumption of correctness).  In this case,

no state appellate court made comprehensive findings of fact.  As background only,

the following factual summary is taken from Warren's Petition for Review to the

California Supreme Court:

**Summary of the Prosecution's Case**

[¶] At about midnight on January 28, 2002, the McDonald's located at Jensen and Highway 99 in Fresno was robbed.  When Toule Her opened the front door to check outside before turning off the lights, he was confronted by a male with a gun.  (RT 377.)  Her and three other employees, manager, Rosalva Castillo, Martha Lorenzo, and Julio Romero, were directed to the office, told not to look at the robber or he would shoot them, and to lie on the floor.  (RT 399, 341, 377, 380.)

[¶] When Castillo identified herself as the manager, the robber pointed his gun at her and directed her to open the safe which she did.  (RT 339, 341.)  The robber directed her to put the money in a towel and then directed her to lie on the floor.  (RT 342.)  She followed both directives.  (RT 341-342.)  The robber left through the back door which set off the alarm.  (RT 343.)  Castillo also called 911, and the police arrived promptly.  (RT 343.)  Castillo gave the police a description of the robber which included the robber's clothing, his race (black), and his height (5'9") and weight (150 lbs.).  (RT 345.)  The robber did not take any personal property of any of the employees.  (RT 361.)

[¶] The money taken from McDonald's included a tracking device which resulted in the money being located in about ten minutes after officers began the search.  (RT 404, 648.)  K-9 Officer Michael Johnson was directed to the area of a large field at the rear of 2465 South Angus by police cars equipped with the tracking device.  (RT 406.)  As he got out of his car, he saw a black male jump up and run west from the middle of the field.  (RT 407.)  Johnson returned to his car and drove between one-half-mile to a mile about one street south of where he had seen the suspect.  (RT 409.)

[¶] He let his dog off the leash and after a couple of minutes saw it standing on the top of pallets in the parking lot barking.  (RT 410.)  The dog went into the pallets, and when Johnson heard appellant say, "get the dog off of me", [sic] Johnson pulled the dog out.  (RT 415.)  As appellant crawled out, the dog was still attached to his wrist.  (RT 415.)  Johnson called for an ambulance because appellant had been bitten on his wrist and lower left leg.  (RT 417-418.)

[¶] Johnson testified that appellant was wearing a blue shirt which was either cut off by the paramedics, at the scene of the arrest, prior to witnesses arriving for the field identification or at the hospital.  (RT 419, 439.)  Appellant wore a plaid flannel shirt under the blue shirt and a white thermal shirt under the plaid shirt.  (RT 420.)

[¶] After appellant was detained, Castillo and Lorenzo were told that the police had the robber and wanted to make sure they had the right

1:07cv1285

person. (RT 345, 362.) Both women were driven to the parking lot where appellant was detained. (RT 345.) Castillo identified appellant as the robber based on the fact that he was black, was present at the show-up, was wearing a white handkerchief around his neck, [FN 3] and his pant's zipper was down as was the robber's. (RT 346, 364, 367, 606.) Castillo noted that appellant was not wearing the same shirt the robber wore.

[FN 3: Officer Johnson testified that he did not see a white handkerchief around appellant's neck. (RT 445.) However, Officer Bishop testified that he removed and booked a white cloth from around appellant's neck. (RT 762-763.)]

[¶] Lorenzo told the police before going for the field identification that she did not think she would be able to identify the robber, and when she viewed appellant, she told the officer that she could not say whether appellant was the robber. (RT 397.) She stated that appellant's size and features were similar to the robber's, but admitted that she had not seen the robber's face and that appellant looked a little thinner than the robber. (RT 397, 400-401.) She testified that the robber's zipper was down and was sure that the appellant's zipper was not down. (RT 393, 399-400.) Both Castillo and Lorenzo identified the bag they were shown at the scene as the one used by the robber to remove the money. (RT 354, 401, 466.)

[¶] A mountain bike was located about seven feet from a bag containing currency. (RT 629-630.) Two officers contradicted each other regarding locating a second bag of currency. Officer Rubio testified that she found the bag of currency, a black beanie, and a white bandanna lying on top of the ground. (RT 620, 627.) Sergeant Rose testified that he located the bag of currency using a hand-held tracking device and that it was buried under a mound of grass and dirt. (RT 649-651.) One bag contained $298 and the other $4,279.29. (RT 468.)

[¶] Appellant was transported to the hospital, where he remained for three hours, for treatment of the dog bites, was then taken to the police department were he vomited, and was returned to the hospital. (RT 420, 610-611.) After appellant was returned to the police department, he was interviewed by Detective Todd Fraizer. Fraizer described appellant as looking dejected and really "bummed out." (RT 672.) Appellant had his head down on the table but after asking appellant a few preliminary questions, Fraizer concluded that appellant was able to understand and answer questions. (RT 673.) Fraizer admitted that when he walked into the interview room that he asked appellant whether he was awake, that appellant had his head on his arm on the table during much of the interview, and that appellant's conduct could indicate that he was tired. (RT 686, 690.) Fraizer knew that appellant had been bitten by the police dog and had been at the hospital twice. (RT 686.)

[¶] Before Fraizer advised appellant of his rights, appellant stated that maybe he could "trade it off for some homicide cases." (RT 673.) When Fraizer asked appellant whether the gun he used might fall into the wrong hands, appellant said that it would not and that he did not bury it. (RT 676.) When Fraizer asked appellant what he planned to do with the money from the robbery, appellant said that he did not have any plans for the money and did not need the money because he had

two jobs. (RT 677, 695.) Several times during the interview appellant said that he blew it or screwed up. (RT 677, 696.) Appellant also said that there was no pre-planning that he just did it. (RT 677, 680.) When Fraizer told appellant that they had recovered $4,500, appellant said that he did not know how much money there was because he had not had time to count it. (RT 677.)

[¶] When Sergeant Rose interrupted the interview to tell Fraizer that a toy gun had been located, appellant asked to speak to Rose and told Rose that he had information regarding two homicides. (RT 679.) After Rose left, Fraizer continued to question appellant about the gun. (RT 679.) Appellant denied that the gun found on the roof was the gun he used, and told Fraizer that he discarded the gun off of Golden State and agreed to show Fraizer the location. (RT 679-680, 710.) Appellant said that he did not throw a gun or anything on the roof because the officers were right behind him. (RT 682.)

[¶] Appellant showed Fraizer the route he took on his bike and directed him to the area of Golden State and Orange. (RT 682, 697.) Fraizer searched the field where appellant said he discarded the gun, but did not locate it. (RT 683-684.) Fraizer also unsuccessfully searched for a pair of white gloves which appellant said he discarded on Date Street. (RT 683-684, 697, 699.)

**Summary of Defense Case:**

[¶] Appellant, who is six-feet-two-inches tall and weighed 207 pounds in January 2002, testified in his own behalf. (RT 756-757.) Appellant was convicted of four felonies (2 of 4 were rape in concert) in 1980 and three felonies in 1992. (RT 715.) He was riding his bike at about 1 a.m., as was his customary workout, when he saw officer Johnson drive by, open the back door of his car, and release his dog. (RT 716-718, 743.) The dog grabbed appellant's leg causing him to get off his bike, struggle with the dog, and then run across the field to the All Star Warehouse where he hid under some pallets. (RT 718-719.)

[¶] Several minutes later, the dog arrived and stood on the pallets barking. (RT 720.) When Johnson arrived, the dog went under the pallets and grabbed and bit appellant's left wrist. (RT 720.) Appellant ran and hid because he was on parole and any contact with the police would be an automatic violation of parole. (RT 719-721.) Appellant was not wearing the blue shirt which Johnson claimed was removed by the paramedics and was not wearing a white cloth around his neck. (RT 721-722.) Appellant saw both items for the first time at the police department. [FN 4] (RT 721-722.) Appellant disagreed that the holes in the blue shirt matched up with the bite on his wrist. (RT 748.) Appellant was wearing a white turtle-neck which was missing at the time of trial. (RT 723.) While officers waited for the witnesses to arrive at the scene, they put clothes on appellant which they brought to the scene and could possibly have put the white cloth around his neck. (RT 758.)

[FN 4: Appellant also saw the blue shirt at the hospital when Johnson placed it on the bed next to appellant when he photographed appellant's bites. (RT 722.)]

7

[¶] Appellant was at the hospital for four-and-one-half to five hours the first time and then when he was taken to the police department, he felt dizzy and vomited and was returned to the hospital where he received treatment by IV. (RT 725.) When he was returned to the police department, he was sleeping in the holding cell, and had to be called several times to awaken. (RT 727.) Appellant felt very tired and drowsy, and was basically asleep, due to the medication, when Fraizer read him his rights. (RT 727, 741, 743.) Neither the telephone number or social security number which appellant gave Fraizer were accurate. (RT 730-732, 757.)

[¶] When appellant asked about making a deal, he was not indicating that he was guilty, but because he had two jobs and was the only person available to take care of his mother. (RT 732, 748.) Appellant hoped that if he gave the police information on the homicides that they would release him. (RT 733.) When appellant told Fraizer that he did not really look at the gun, he was just talking to be talking. (RT 734.) He was trying to cooperate so he could save his jobs. (RT 734.) When he told Fraizer that he blew it, he meant that he would not be able to report to work and would lose his jobs. (RT 734.)

[¶] When he told Fraizer that he was stupid, he meant that it was stupid being in the vicinity where he was arrested. (RT 735.) Appellant had not intended to go riding if it rained, but he went anyway because he needed an extensive workout. (RT 735.) Appellant agreed to go with Fraizer to look for the gun just for the ride. (RT 737.) Appellant was so tired that he fell asleep in the patrol car. (RT 737.) Fraizer picked the street where he went to look for the gun; appellant was just trying to cooperate. (RT 737, 751.) Appellant did not tell Fraizer that he did not rob McDonald's because Fraizer did not ask him that question. (RT 739.)

(Resp't Lod. G at 2-10.)

## III.   **DISCUSSION**

### A.   **Scope of Review**

Title 28, United States Code, section 2254(a), sets forth the following scope of review for federal habeas corpus claims:

[¶] The Supreme Court, a Justice thereof, a circuit judge, or a district court shall entertain an application for a writ of habeas corpus in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in ***violation of the Constitution or laws or treaties of the United States.***

28 U.S.C. § 2254(a) (West 2008) (emphasis added).  As amended, 28 U.S.C. section 2254(d) reads:

[¶] (d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was ***adjudicated on the merits*** in

1:07cv1285

State court proceedings unless the adjudication of the claim –

> [¶] (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

> [¶] (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d)(1)-(2) (West 2008) (emphasis added).

"[The Antiterrorism and Effective Death Penalty Act ("AEDPA")] establishes a 'highly deferential standard for evaluating state-court rulings, which demands that state-court decisions be given the benefit of the doubt.'" *Womack v. Del Papa*, 497 F. 3d 998, 1001 (9th Cir. 2007), quoting *Woodford v. Viscotti*, 537 U.S. 19, 24 (2002).  To obtain federal habeas relief, Gruber must satisfy either section 2254(d)(1) or section 2254(d)(2).  *See Williams v. Taylor*, 529 U.S. 362, 403 (2000).  The Supreme Court interprets section 2254(d)(1) as follows:

> Under the "contrary to" clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by this Court on a question of law or if the state court decides a case differently than this Court has on a set of materially indistinguishable facts.  Under the "unreasonable application" clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from this Court's decisions but unreasonably applies that principle to the facts of the prisoner's case.

*Williams*, 529 U.S. at 412-13; *see also Lockyer v. Andrade*, 538 U.S. 63, 73-74 (2003).  The "objectively unreasonable" standard is not met by a showing of error or of an incorrect application (as opposed to an objectively unreasonable application) of the governing federal law.  *Andrade,* 538 U.S. at 75; *Woodford,* 537 U.S. at 25; *Bell v. Cone*, 535 U.S. 685, 694, 699 (2002) ("it is not enough to convince a federal habeas court that, in its independent judgment, the state court decision applied [the Supreme Court precedent] incorrectly").  As the Supreme Court explained, this standard is different from the "clear error" standard in that "[t]he gloss of clear error fails to give proper deference to state court by conflating error (even clear error) without unreasonableness." *Andrade,* 538 U.S. at 75.

Where there is no reasoned decision from the state's highest court, this Court "looks through" to the underlying appellate court decision. *Ylst v. Nunnemaker*, 501 U.S. 797, 801-06 (1991). If the dispositive state court order does not "furnish a basis for its reasoning," federal habeas courts must conduct an independent review of the record to determine whether the state court's decision is contrary to, or an unreasonable application of, clearly established Supreme Court law. *See Delgado v. Lewis*, 223 F.3d 976, 982 (9th Cir. 2000) (overruled on other grounds by *Lockyer*, 538 U.S. at 75-76); *accord Himes v. Thompson*, 336 F.3d 848, 853 (9th Cir. 2003). A state court, however, need not cite Supreme Court precedent when resolving a habeas corpus claim. *Early v. Packer*, 537 U.S. 3, 8 (2002). "[S]o long as neither the reasoning nor the result of the state-court decision contradicts [Supreme Court precedent,]" *id.*, the state court decision will not be "contrary to" clearly established federal law. *Id.*

### B. Analysis

Warren claims that: (1) he was denied due process when he was sentenced consecutively in violation of Penal Code section 654; (2) he was denied a fair trial because the evidence was constitutionally insufficient to support second degree robbery; (3) his trial counsel was constitutionally ineffective for failing to fully investigate his case; and (4) the trial court violated his right to due process when it refused to specify the length of a continuance prior to hearing the merits of his motion for self-representation. (*See* Pet. at Grounds 1-4 and attachments.)

### i. Consecutive sentencing under California law

Warren contends he was denied due process when he was sentenced consecutively in violation of Penal Code section 654. (Pet. at Ground One.) Warren raised Ground One in his second habeas petition (and amendment) to the California Supreme Court. (Resp't Lods. Y & Z.) The California Supreme Court denied the petition and cited *In re Clark*, 5 Cal.4th 750 (1993); *In re Swain*, 34 Cal.2d 300, 304 (1949); *People v. Duvall*, 9 Cal.4th 464, 474 (1995); and *In re*

1:07cv1285

1  *Lindley,* 29 Cal.2d 709 (1947).  (Resp't Lod. AA.)  The last state court decision to

2  address the merits of this claim is the Fresno County Superior Court's opinion

3  denying the claim (Resp't Lod. P), and that is the decision reviewed here.  *Ylst*, 501

4  U.S. at 801-06.  That court found:

5  [¶] Petitioner contends that the court improperly sentenced him to
   multiple consecutive terms for a single incident, in violation of Penal
6  Code section 654.  The documents attached to the petition show that
   the court sentenced petitioner under the 'Three Strikes' law to four
7  consecutive terms of twenty five-years to life for violation of Penal
   Code section 211 (robbery), four 10-year terms for violation of Penal
8  Code section 12022.53(b), plus two 5-year enhancements under Penal
   Code section 667(a)(1), for a total sentence of 150 years.  All of the
9  charges arise out of one incident on January 28, 2002, in which
   petitioner used a firearm to rob a McDonald's restaurant.

10
   [¶] Petitioner claims that Penal Code section 654 bars imposition of
11 multiple sentences for what amounts to a single incident of robbery.
   Penal Code section 654(a) states:

12
        [¶] An act or omission that is punishable in different ways
13      by different provisions of law provides for the longest
        potential term of imprisonment, but in no case shall the act
14      or omission be punished under more than one provision.
        An acquittal or conviction and sentence under any one
15      bars a prosecution for the same act or omission under any
        other.

16
   [¶] However, the Courts of Appeal have found that it is not a violation
17 of Penal Code section 654 to charge a defendant with multiple crimes
   arising out of a single incident where there were multiple victims.  (See
18 *People v. Alvarez* (1992) 9 Cal.App.4th 121, 127-128; *People v.
   Williams* (1993) 14 Cal.App.4th 601, 604-605.)  Here, petitioner
19 committed a robbery with four separate victims.  Therefore, Penal Code
   section 654 does not bar imposition of multiple consecutive sentences.

20

21 (Resp't Lod. P at 1-2.)

22     Generally, "[a] federal court may not issue the writ [of habeas corpus] on the

23 basis of a perceived error of state law."  *Pulley v. Harris*, 465 U.S. 37, 41 (1984).

24 Only errors of federal law can support federal intervention in state court

25 proceedings, and only to correct such errors.  *Oxborrow v. Eikenberry*, 877 F.2d

26 1395, 1399 (9th Cir. 1989) (stating that federal courts are not concerned with errors

27 of state law unless they rise to the level of a constitutional violation).  Additionally,

28 federal habeas courts are bound by the state's interpretation of its own laws.

1:07cv1285

*Wainwright v. Goode*, 464 U.S. at 78, 894 (1983)*; Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991); *Himes v. Thompson*, 336 F.3d 848, 852 (9th Cir. 2003) (holding that federal courts may not reexamine state court determinations on state law issues). Federal courts are bound by a state court's construction of its own penal statutes, and must defer to that interpretation, unless it is "untenable or amounts to a subterfuge to avoid federal review of a constitutional violation." *Aponte v. Gomez,* 993 F.2d 705, 707 (9th Cir. 1993).

Petitioner has not shown that any alleged sentencing error amounted to a violation of his due process rights so as to indicate that his case falls outside the general rule regarding a state's interpretation of its own laws.  The issue of whether California law permitted consecutive sentencing based on four separate counts of second degree robbery arising out of a single incident was a legal question for the state courts.  At trial, the victims testified that the robber held four of them at gunpoint, and threatened their lives, while he robbed the store.  (*See* 3 RT 333-60; 374-83; 390-97.)  The state court found that the trial court properly applied Penal Code section 654 when it consecutively sentenced Warren on four counts of second degree robbery, and enhancements, under state law.  The state court's interpretation of California law was neither untenable nor did it amount to a subterfuge to avoid federal review of a constitutional violation.  *See Aponte*, 993 F.2d at 707. Accordingly, Warren's argument raises no issue justifying federal habeas relief because this Court must defer to and is bound by California's interpretation of its own laws.  *Himes*, 336 F.3d at 852.  Thus, the state court's denial of this claim was neither contrary to, nor an unreasonable application of, clearly established Supreme Court law.  *See* 28 U.S.C. § 2254(d); *Williams*, 529 U.S. at 412-13.  Ground One is **DENIED.**

### ii.    Insufficient evidence to support second degree robbery

Warren contends he was denied a fair trial in that the evidence presented was constitutionally insufficient to support second degree robbery.  (Pet. at Ground

1:07cv1285

Two.)  Warren raised Ground Two in his second habeas petition (and amendment) to the California Supreme Court.  (Resp't Lods. Y & Z.)  The California Supreme Court denied the petition and cited *In re Clark*, 5 Cal.4th 750 (1993); *In re Swain*, 34 Cal.2d 300, 304 (1949); *People v. Duvall*, 9 Cal.4th 464, 474 (1995); and *In re Lindley,* 29 Cal.2d 709 (1947).  (Resp't Lod. AA.)  While the superior and appellate courts denied the claims, neither issued a "reasoned decision" in conjunction with the denial.  (*See* Resp't Lods. N & T.)  Accordingly, this Court conducts an independent review of the record to determine whether the state court's denial was contrary to, or an unreasonable application of, clearly established Supreme Court law.  *See Delgado,* 223 F.3d at 982; *accord Himes,* 336 F.3d at 853.

Evidence is constitutionally insufficient to support a conviction "if it is found that upon the evidence adduced at the trial no rational trier of fact could have found proof of guilt beyond a reasonable doubt."  *Jackson v. Virginia*, 443 U.S. 307, 324 (1979).  In deciding whether the evidence was constitutionally sufficient, this Court must look to "the substantive elements of the criminal offense as defined by state law."  *Jackson*, 443 U.S. at 324, n. 16.  Penal Code section 211 states:  ". . . Robbery is the felonious taking of personal property in the possession of another, from his person or immediate presence, and against his will, accomplished by means of force or fear."  The trial court instructed the jury as follows:

[¶] Defendant is accused in Counts 1, 2, 3 and 4 of having committed the crime of robbery, a violation of section 211 of the Penal Code.[1]

[¶] Every person who takes personal property in the possession of another, against the will and from the person or immediate presence of that person, accomplished by means of force or fear and with the specific intent permanently to deprive that person of the property, is guilty of the crime of robbery in violation of Penal Code section 211.

[¶] "Immediate presence' means an area within the alleged victim's reach, observation or control, so that he or she could, if not overcome by violence or prevented by fear, retain possession of the subject property.

---

[1]The trial court itself determined, as a matter of law, that if Warren was guilty of robbery it was second degree robbery.  (*See* CT 195.)

1    [¶] "Against the will" means without consent.

2    [¶] In order to prove this crime, each of the following elements must be
     proved:

3         1. A person had possession of property of some value however slight;
          2. The property was taken from that person or from his/her immediate
4    presence;
          3. The property was taken against the will of that person;
5         4. The taking was accomplished either by force or fear; and
          5. The property was taken with the specific intent permanently to
6    deprive that person of the property.

7

8    (CT at 192.)  The jury was further instructed regarding the legal definitions of

     "possession:"
9
10   [¶] There are two kinds of possession: actual possession and
     constructive possession.

11   [¶] Actual possession requires that a person knowingly exercise direct
     physical control over a thing.
12
13   [¶] Constructive possession does not require actual possession but does
     require that a person knowingly exercise control over or the right to
     control a thing, either directly or through another person or persons.
14   One person may have possession alone, or two or more persons
     together may share actual or constructive possession.
15

16   (CT at 193.)

17       A review of the record of Warren's trial reveals that the state court's denial of

18   Warren's claim was not contrary to, or an unreasonable application of, *Jackson* in

19   light of California law.  At trial, the prosecution presented the following evidence

20   from which the jury could reasonably conclude that Warren committed robbery as

21   defined by California law:

22       On January 28, 2002, Rosalva Castillo was working as swing manager for the

23   McDonald's restaurant at 3110 East Jensen in Fresno, California.  (3 RT 333-34.)

24   At approximately midnight (the restaurant closed at 11:00 pm), Ms. Castillo and

25   three other employees (Toule Her, Martha Lorenzo, and Julio Romero) were

26   cleaning the restaurant and counting the money from the day's business.  (3 RT 335-

27   36.)  As the four employees were readying to leave the restaurant for the night, Mr.

28   Her opened the front door to check the outside area (which was standard procedure),

                                              14                                    1:07cv1285

and a man grabbed the front door and entered the store.  He was dark-skinned and

wore jeans, a colored shirt, a hat, and his face was covered with a white

handkerchief.  He had a small handgun, which he pointed at the employees.  (3 RT

337-38; 376-78; 391-90.)  The employees were very frightened.  (3 RT 338, 378.)

The man asked who the manager was, and eventually Ms. Castillo spoke up

that she was the manager, although she was hoping the other manager – Mr. Her –

would speak up because Ms. Castillo was 32 weeks pregnant at the time of the

robbery.  (RT 339.)  The man directed Ms. Castillo to go to the safe, which was in

the office, and he ordered everyone else to lay on their stomachs in the office.  He

said that if they looked, he would shoot them.  (3 RT 339-41; 380; 393.)  Because

she was nervous, it took Ms. Castillo a couple of attempts to open the safe.  When

she did, the robber grabbed a bag made from towel material, and he told her to put

the money in the bag.  She did so, and the robber then told her to get on her stomach

with the other three employees.  Ms. Castillo complied.  The robber walked among

the employees lying on the floor, stepped on at least one of them, and then left the

restaurant.  He exited through the back door, which set off an alarm, and, when that

occurred, Ms. Castillo called the police on her cell phone.  (3 RT 341-343; 381;

395.)  At some point during the robbery, the intruder yanked all the telephones our

of the walls.  (3 RT 343.)  Ms. Castillo became even more scared after the police

arrived and the realization of what had occurred set in.  (3 RT 344.)

Within minutes of the robbery, Officer Johnson, with the assistance of a K-9

officer,  tracked the robber using a small transmitter contained in the money taken

from the restaurant.  The tracking device led them to a field and, as the officer

approached, Warren jumped up and began to run.  (3 RT 403-08.)  When Warren

jumped a fence, Officer Johnson and the K-9 got back in their patrol car and

pursued Warren.  Other officers joined the pursuit and set up a perimeter to cut

Warren off as he ran.  (3 RT 408-09.)  Officer Johnson let his K-9 off leash in an

open parking lot containing stacks of pallets.  The dog barked to indicate that he had

found someone, and the police apprehended Warren hiding among the pallets.  (3 RT 410-11; 414-16.)  Warren was apprehended approximately two miles from the McDonald's that was robbed.  (3 RT 446.)  A cloth knit bag containing money was found less than ten feet from Warren's mountain bike, which he had abandoned in the dirt field just off of North Avenue west of East Avenue.  (4 RT 629, 638-39, 641.)  A second bag containing money, along with a watch cap and a piece of a T-shirt, was found in another part of the same field with the help of the tracking device.  (4 RT 647-51.)

Shortly after the robbery, the police transported Ms. Castillo and Ms. Lorenzo to the location where they had Warren in custody.  Ms. Castillo identified Warren as the robber despite the fact that he appeared to be wearing a different shirt than during the robbery (a blue shirt had, in fact, been taken off Warren after his apprehension).  The suspect had a white handkerchief around his neck, like the one the robber wore over his face, and the zipper on his pants was down, as was the zipper on the robber's pants.  (3 RT 345-47; 392-93; 397; 464.)  Ms. Castillo positively identified the money bag shown to her by the police at the time she viewed the suspect as the same money bag taken from the restaurant by the robber.  (3 RT 401; 466.)  In court, Ms. Castillo identified Warren as the man who had robbed the McDonald's.  (3 RT 347.)

When questioned at the police station, Warren stated on several occasions, "I just blew it."  He then offered to provide evidence regarding two homicides in exchange for a deal on the robbery case.  (4 RT 667-69; 673-74, 677.)  When the investigating officer questioned Warren about the gun used in the robbery and its location, Warren responded that "it would not fall into the wrong hands."  The officer asked him if he buried the gun, as he did the money, and Warren stated that he did not.  Eventually, Warren told the officer that he discarded the gun off Old Highway 99.  (4 RT 676; 680.)  Warren told the interviewing officer that he had no plans for the stolen money, that he did not need the money, and that he had not pre-

planned the robbery.  After the interview, Warren physically showed the officer the route he took from the McDonald's on his bike, and the location in the field where he had discarded the gun and a pair of white gloves he wore during commission of the robbery.  (4 RT 682-84.)

Warren testified in his own defense that he was riding his bike at approximately 1:00 a.m. on the morning of the robbery because he does "extensive workouts."  (4 RT 716.)  He was forced off his bike when he had to defend himself against the dog that bit his leg and ran away from the police and across the field because he was on parole, and contact with the police is an automatic violation.  (4 RT 717-19.)  Warren then hopped the fence to All Star Warehouse and hid under some pallets.  About ten or fifteen minutes later, the dog found him again and grabbed and bit his left arm.  He was then apprehended by the police.  (4 RT 719-20.)  At trial, Warren denied committing the robbery.

Warren argues that, because he was never positively identified by any witness - coupled with evidence discrepancies regarding clothing, the gun, the bike, and the money bags - he could not fairly have been convicted of robbery.  (Petition at Ground Two.)  Petitioner is incorrect.  Given the evidence presented, there was ample basis upon which the jury could conclude beyond a reasonable doubt that Warren committed robbery.  Ms. Castillo, the restaurant employee who had opened the safe and had the most direct interaction with Warren during the robbery, identified him as the robber.  A bag containing money from the restaurant was found by police less than ten feet from Warren's bike in the middle of a field.  Despite the fact that he claimed to be on an "extensive workout" at 1:00 a.m. on the rainy night of the robbery, Warren ran from police.  Once apprehended, Warren made self-incriminating statements to police, stating that the gun used would not fall into the wrong hands, stating that he had not planned the robbery, showing the police the route he took on his bike from the McDonald's after the robbery, and attempting to strike a deal with information regarding other crimes.   The

1:07cv1285

1  combination of direct and circumstantial evidence presented was more than

2  sufficient to support a robbery conviction.

3      Because a rational trier of fact could have found beyond a reasonable doubt

4  that Warren committed armed robbery at the McDonald's, the state court's denial of

5  this claim was neither contrary to, nor an unreasonable application of, clearly

6  established Supreme Court law.  *See* 28 U.S.C. § 2254(d); *Williams*, 529 U.S. at

7  412-13.  Accordingly, Ground Two is **DENIED**.

8              ### iii.    Ineffective assistance of trial counsel

9      In Ground Three, Warren contends trial counsel was constitutionally

10 ineffective for failing to properly investigate his case and prepare a defense.  (Pet. at

11 Ground Three.)  Warren raised Ground Two in his second habeas petition (and

12 amendment) to the California Supreme Court.  (Resp't Lods. Y & Z.)  The

13 California Supreme Court denied the petition and cited *In re Clark*, 5 Cal.4th 750

14 (1993); *In re Swain*, 34 Cal.2d 300, 304 (1949); *People v. Duvall*, 9 Cal.4th 464,

15 474 (1995); and *In re Lindley,* 29 Cal.2d 709 (1947).  (Resp't Lod. AA.)  While the

16 superior and appellate courts denied the claims, neither issued a "reasoned decision"

17 in conjunction with the denial.  (*See* Resp't Lods. N & T.)  Accordingly, this Court

18 conducts an independent review of the record to determine whether the state court's

19 denial was contrary to, or an unreasonable application of, clearly established

20 Supreme Court law.  *See Delgado,* 223 F.3d at 982; *accord Himes,* 336 F.3d at 853.

21     *Strickland v. Washington*, 466 U.S. 668 (1984), contains clearly established

22 Supreme Court law regarding collateral claims of ineffective assistance of counsel.

23 *Strickland* requires a two-part showing.  First, an attorney's representation must

24 have fallen below an objective standard of reasonableness.  *Id*. at 688.  *Strickland*

25 requires that "[j]udicial scrutiny of counsel's performance . . . be highly

26 deferential."  *Id*. at 689.  There is a "strong presumption that counsel's conduct falls

27 within a wide range of reasonable professional assistance."  *Id*. at 686-87.  Second,

28 a defendant must have been prejudiced by counsel's errors.  *Id*. at 694.  Prejudice

1  can be demonstrated by a showing that "there is a reasonable probability that, but

2  for counsel's unprofessional errors, the result of the proceeding would have been

3  different.  A reasonable probability is a probability sufficient to undermine

4  confidence in the outcome."  *Id*.; *see also Fretwell v. Lockhart*, 506 U.S. 364, 372

5  (1993).  A federal court need not address both the deficiency prong and the

6  prejudice prong if the petitioner fails to make a sufficient showing of either one.

7  *Strickland*, 466 U.S. at 697.  Specifically, the Ninth Circuit has held that failure to

8  file a motion will not constitute ineffective assistance of counsel unless the trial

9  court would have granted the motion.  *Wilson v. Henry*, 185 F.3d 986, 990 (9th Cir.

10  1999).

11  Warren contends that trial counsel failed to fully investigate the evidence

12  regarding identification used to convict him, but he does not state what that further

13  investigation would have revealed.  He alleges "[h]ad counsel fully investigated he

14  would have discovered that the weight, height, size, clothing and complexion of the

15  alleged (perpetrator) was someone other than me."  (Pet. at Ground Three and

16  attached page.)  He further contends that counsel's refusal to "put on any of my

17  witnesses" and failure to interview the victims or arresting officers about his

18  missing clothing resulted in prejudice.  Warren fails to specify, however, what

19  witnesses he refers to, what additional, exculpatory evidence would have been

20  uncovered by counsel's further investigation, and what exculpatory testimony

21  would have been offered by the un-called witnesses.  Conclusory allegations that are

22  not supported by specific facts do not merit habeas relief.  *James v. Borg*, 24 F.3d

23  20, 26 (9th Cir.), *cert. denied*, 513 U.S. 935 (1994); *O'Bremski v. Maass*, 915 F.2d

24  418, 420 (9th Cir. 1990) (the petitioner must state facts which point to a real

25  possibility of constitutional error); *see Blackledge v. Allison*, 431 U.S. 63, 74, 52

26  L.Ed.2d 136 (1977)(conclusory allegations re involuntary guilty plea are subject to

27  dismissal).  Moreover, some contradictory evidence was presented at trial on the

28  issues of identification, and the jury still found Warren guilty of armed robbery.

1:07cv1285

1   Warren has made no showing that any additional evidence on this subject would

2   have been likely to change the outcome.

3        Even though Warren's failure to show prejudice as a result of counsel's

4   representation is enough to deny his claim, the record reflects that defense counsel

5   Mr. Richter provided a thorough defense based on the following theories:  Ms.

6   Castillo's identification of Warren as the robber was not credible, in part because

7   the description she gave to the police at the time of the robbery was different from

8   Warren's description; the police improperly handled or tampered with several items

9   of physical evidence, undermining the prosecution's case; and Warren was so

10  drugged from his hospital visit, or tired, or both, when questioned by Officer Fraizer

11  that he essentially slept or was incoherent throughout the police interview.  (*See* 5

12  RT 909-50, counsel's closing argument.)  Mr. Richter cross-examined Ms. Castillo,

13  who provided the lone positive identification of Warren as the robber, to undermine

14  the strength of that identification.  (3 RT 360-72.)  He cross-examined each and

15  every police witness at trial, pointing out the inconsistencies in their stories and the

16  improper handling of evidence.  (4 RT 603-17, 624-26, 633-44, 658-69, 685-99.)

17  Mr. Richter questioned Warren on direct examination and Officer Fraizer on cross-

18  examination in a thorough  attempt to undermine the prosecution's evidence that

19  Warren made self-incriminating statements when interviewed by Officer Fraizer.  (4

20  RT 723-38; 685-99.)  He also called a defense investigator who provided

21  photographs of the area where Warren was chased and eventually apprehended by

22  police.  (5 RT 902-09.)  The fact that the defense was ultimately unsuccessful does

23  not mean that it was deficient, and Warren makes no showing of deficiency

24  warranting habeas relief.

25        Thus, the state court's denial of this claim was neither contrary to, nor an

26  unreasonable application of, clearly established Supreme Court law.  *See* 28 U.S.C.

27  § 2254(d); *Williams*, 529 U.S. at 412-13.  Accordingly, Ground Three is **DENIED.**

28  //

1

### iv.  *Faretta* **motion**

2      In Ground Four, Warren contends that the trial court violated his right to due

3  process when it insisted that he proceed with his *Faretta* motion (to represent

4  himself) while refusing to inform him how long a trial continuance the court would

5  order if the motion were granted.  (Pet. at Ground Four.)  Because the court would

6  not specify the length of any continuance, Warren contends he was compelled to

7  withdraw his *Faretta* motion in violation of his fundamental rights.  Warren raised

8  Ground Four in his petition for review to the California Supreme Court.  (Resp't

9  Lod. G.)  The California Supreme Court denied the petition.  (Resp't Lod. H.)[2]  The

10  last state court decision to address the merits of this claim is the appellate court's

11  opinion denying the claim (Resp't Lod. D), and that is the decision reviewed here.

12  *Ylst*, 501 U.S. at 801-06.  That court found:

13      **[¶] Facts**

14      [¶] Appellant informed the court on May 13, 2003, that he desired to
assert his right to self-representation under *Faretta v. California,*

15  *supra*, 422 U.S. 806.  After appellant filled out a form, the court
explained to appellant the rights, risks, and consequences of self-

16  representation.  Appellant then asked the court how long a continuance
he would receive if the motion was granted.  When the court asked

17  appellant if the length of a continuance had "a bearing on [his] *Faretta*
request," appellant responded, "Yes."  Because appellant stated that his

18  decision to pursue the motion was contingent upon the anticipated
length of a continuance, the court pressed him four times to

19  unequivocally state whether or not he was asserting his *Faretta* right.
The court made it clear that if he asserted his *Faretta* right that "[he]

20  would grant a reasonable continuance.["]  The court declined to state
exactly how long a "reasonable continuance" would be, reserving that

21  determination until after it heard and decided the motion on the merits.
Before making a final decision, appellant consulted his attorney and

22  then decided to unconditionally withdraw the motion.

23

24  ─────────────────

25      [2]In his petition for review, Warren raised the *Faretta* claim raised herein as Ground Four and
an additional claim not raised in this federal petition alleging that certain sentencing factors were not

26  found by the jury beyond a reasonable doubt. (Resp't Lod. G.)  The California Supreme Court denied
the petition saying "Petition for review denied without prejudice to any relief to which defendant might

27  be entitled after this court determines in *People v. Black*, S126182, and *People v. Towne*, S125677,
the effect of *Blakely v. Washington* (2004) ___ U.S. ___ S.Ct. 2531, on California law." (Resp't Lod.

28  I.)  *Black*, *Towne*, and *Blakely* are cases concerning the requirement of jury-found facts to be used to
enhance sentences and, as such, do not pertain to Warren's *Faretta* claim reviewed here.

1:07cv1285

**[Discussion]**

[¶] A defendant in a criminal case possesses two mutually exclusive constitutional rights respecting representation: the right to counsel and the right to self-representation. (*People v. Marshall* (1997) 15 Cal. 4th 1, 20.) In the exercise of a free and intelligent choice, an accused may waive his constitutional right to assistance of counsel. (*Faretta v. California, supra,*, 422 U.S. at pp. 814-815.) However, California requires that "in order to invoke [that] . . . right of self-representation a defendant in a criminal trial should make an *unequivocal* assertion of that right within a reasonable time prior to the commencement of trial." (*People v. Windham* (1077) 19 Cal.3d 212, 127-128, italics added.) "[A] motion made out of a temporary whim, or out of annoyance or frustration, is not unequivocal – even if the defendant has said he or she seeks self-representation." (*People v. Marshall, supra*, 15 Cal.4th at p. 21.) Consequently, """"the right of self-representation is waived unless defendants articulately and unmistakably demand to proceed *pro se*."""" (*People v. Danks* (2004) 32 Cal.4th 269, 295.) "'In determining on appeal whether the defendant invoked the right to self-representation, we examine the entire record de novo.'" (*Ibid.;* see also *People v. Dent* (2003) 30 Cal.4th 213, 218.)

[¶] It is well settled that if a trial court grants a *Faretta* motion, then a defendant is "entitled to a reasonable time to prepare for trial if necessary." (*People v. Clark* (1992) 3 Cal.4th 41, 110.) Appellant belabors this uncontested point and asserts judicial error based upon two assumptions: that a *Faretta* motion was actually made and that said motion was effectively denied. A refutation of the first renders moot the second.

[¶] The Supreme Court emphasizes the importance of an unequivocal demand for self-representation and directs trial courts facing *Faretta* motions to "evaluate not only whether the defendant has stated the motion clearly, but also the defendant's conduct and other words." (*People v. Valdez* (2004) 32 Cal.4th 73, 98.) Moreover, "the *Faretta* right is forfeited unless the defendant "'articulately and unmistakably'" demands to proceed in propria persona." (*Id.* at p. 99.) The *Valdez* Court held that a defendant cannot invoke the *Faretta* right to self-representation by using conditional words like "if," because those words do not satisfy the standard requiring an *articulate and unmistakable demand* to proceed pro se. (*Ibid.*; see also *People v. Hines* (1997) 15 Cal.4th 997, 1028.)

[¶] When appellant filled out the form requesting self-representation and submitted it to the court, it may have appeared initially that he was unequivocally asserting his constitutional right to self-representation. However, the ensuing interchange revealed appellant did not want to proceed with the motion unless the court would specifically state how long a continuance would be given if the motion was granted. "Because the court should draw every reasonable inference against waiver of the right to counsel, the defendant's conduct or words reflecting ambivalence about self-representation" are important considerations. (*People v. Valdez, supra*, 32 Cal.4th at p. 98.) The trial record shows a series of "if, then" statements and queries between the court and appellant. Appellant failed to articulately and unmistakably

demand to proceed pro se, and therefore in accordance with the Supreme Court, we conclude appellant never invoked his *Faretta* right. (*People v. Valdez, supra*, 32 Cal.4th at p. 99.)

[¶] Since appellant failed to invoke and therefore waived his *Faretta* right, we need not consider appellant's second contention that the court's refusal to state a specified length of continuance effectively denied the *Faretta* motion.  We do note, however, that requiring a court to determine an issue before it becomes necessary to do so is contrary to considerations of judicial economy and the orderly administration of justice.  Placing the cart before the horse, if you will, serves no rational purpose in a court of law.

(Resp't Lod. D at 2-4.)

_____On May 13, 2003, the day of trial, the court was informed that Warren wished to bring a *Faretta* motion to relieve counsel and defend himself at trial.  (2 RT 107.) As the trial court began to conduct a hearing on the issue, it became apparent that Warren wanted a substantial continuance of the trial date so that he could investigate the case.  The prosecution opposed a continuance.  (2 RT 107-13.)  After taking a recess to research the issue, the court and Warren had the following exchange:

[¶] The Court: . . . The court is satisfied that if I granted your Faretta motion you would be entitled to a reasonable continuance.  But your definition of reasonable and mine may vary, so I can't go beyond that. But I will say that I would grant you a reasonable continuance.  But the big issue at this point is we're here at the first day of trial.  Based on what Mr. Donovan has stated I would grant you a reasonable continuance.  Do you want to go forward on the Faretta motion?

[¶] The Defendant: Well, how much is a reasonable - -

[¶] The Court: Well, I can't get into all those details.

[¶] The Defendant: Because I'm going to have to get the investigator.

[¶] The Court: You're going to have to make a decision on whether or not you want to go forward on the Faretta motion.  Okay?  That's what you have to make a decision on.  I've told you that the law requires that I grant you a reasonable continuance Okay.  I can't give you all the details of the continuance.  Either you want the Faretta motion or you don't.

[¶] The Defendant: What I would be asking the court for is at least a month and a half on a continuance.

[¶] The Court: I'm not going to be put in a bind.  Okay? . . . You either

1:07cv1285

want this Faretta motion to go forward or you are withdrawing it. I'm not going to answer any more questions. Tell me what you want to do. I'm - - do you want to go forward on the Faretta motion or not? I'm not going to answer any more questions. You've heard what I said.

[¶] The Defendant: Then you are leaving me in a position to - - I don't know if I'm going to get the continuance time that I'm requesting.

[¶] The Court: There is a question pending, Mr. Warren. Please answer it.

[¶] The Defendant: I'll withdraw it for the time being.

[¶] The Court: See, I don't understand what that means, for the time being. You either want the - - you either want me to go forward on the motion and hear it completely or you don't want a Faretta motion. What does for the time being - - do you mean in the middle of the trial you plan to request a Faretta motion?

[¶] The Defendant: Because you are not giving me enough time to actually know how much time I'm going to have to investigate this thing, since it's a widespread area of it.

[¶] The Court: Let's assume that the attorney made a request for a continuance. And he told the court, well, Your Honor, I don't want this request unless it's a month and a half. You've been in courts enough to know that the attorney makes his best pitch and the court makes the decision. He can't condition his motion on a preconceived answer. Court doesn't give him an answer before he makes his argument for the motion. The court waits and hears the pros and cons and then he makes a decision.

[¶] I'm not going to guarantee you anything. I told you that the law requires that I give you a reasonable continuance. I'm not going to tell you what it is. I want to make that decision myself after I hear your request. So you have to decide whether or not you want this Faretta motion or not. It's a separate issue.

[¶] Do you want some time to discuss this issue with your attorney?

. . .

[¶] Right now you still have an attorney because we haven't had the Faretta hearing. We're in the midst of this now. But if you tell me you want to withdraw your motion, then it's over. But you have to - - you have to make a decision Mr. Warren.

[¶] Mr. Richter: Let me just consult with him.

(Defendant speaks with attorney off the record.)

[¶] The Defendant: Okay. I'm going to withdraw the Faretta motion.

[¶] The Court: Now this last time when you said that you didn't say the words for now. So are you withdrawing that hearing?

1:07cv1285

1   [¶] Yes.

2   [¶] The Court: All right.  I'm not requesting any reason, but if you want
    to state a reason, you can.

3   [¶] No.  I'm satisfied.

4

5   (2 RT 114-17.)

6       It is clearly established Supreme Court law that a criminal defendant has the

7   right to decide "whether in his particular case counsel is to his advantage" after

8   being thoroughly advised of the "traditional benefits associated with the right to

9   counsel." *Faretta v. California*, 422 U.S. 806, 834-35 (1975).  The Supreme Court

10  held that forcing Faretta "to accept against his will a state-appointed public defender

11  . . . deprived him of his constitutional right to conduct his own defense." *Faretta*,

12  422 U.S. at 836.  A key to the Supreme Court's holding, however, was the fact that

13  "Faretta clearly and unequivocally declared to the trial judge that he wanted to

14  represent himself and did not want counsel" in addition to the trial court having

15  established that Faretta was making a fully informed and voluntary decision.

16  *Faretta*, 422 U.S. at 835.

17      As set forth in the above excerpt from trial, Warren did not clearly and

18  unequivocally declare that he wanted to represent himself.  In fact, after the

19  colloquy with the trial court, Warren withdrew his motion.  Warren provides no

20  authority, and this Court is aware of none, that requires a trial court to entertain a

21  motion pursuant to *Faretta* after the defendant has withdrawn it.  Thus, the state

22  court's denial of this claim was neither contrary to, nor an unreasonable application

23  of, clearly established Supreme Court law.  *See* 28 U.S.C. § 2254(d); *Williams*, 529

24  U.S. at 412-13.  Accordingly, Ground Four is **DENIED.**

25  **IV.   <u>CONCLUSION</u>**

26      For all the foregoing reasons, the Petition is **DENIED WITH PREJUDICE**.

27      Pursuant to 28 U.S.C. § 2253, the Court **GRANTS** Petitioner a Certificate of

28  Appealability on the claims that insufficient evidence was presented to support

1:07cv1285

1  convictions for second degree robbery, that trial counsel provided constitutionally

2  ineffective representation, and that the trial court violated Warren's right to due

3  process when it refused to specify the length of continuance prior to hearing the

4  merits of his *Faretta* motion.  (Pet. at Grounds Two, Three, and Four.)  A Certificate

5  of Appealability as to the California state law claim (Pet. at Ground One) is

6  **DENIED.**

7          **IT IS SO ORDERED.**

8  DATED:  November 4, 2009

9                                                          _____

10                                                        Hon. Jeffrey T. Miller
                                                          United States District Judge

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1:07cv1285